**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GREGORY SIBLEY,** | : | **Case No. 1:05cv0550** |
| | : | |
| **Plaintiff,** | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| **v.** | : | |
| | : | **MEMORANDUM & ORDER** |
| **ALCAN, INC., et al.,** | : | |
| | : | |
| **Defendants.** | : | |

On February 10, 2005, Plaintiff Gregory Sibley ("Sibley") filed a Complaint in this Court against Defendants Alcan, Inc. and Alcan Management Services, U.S.A., Inc. ("AMS")(collectively, "Alcan" or the "Alcan entities"). Jurisdiction is based on diversity of citizenship. Sibley is a citizen of the State of Michigan; the Alcan entities are citizens of a different state. The amount in controversy is alleged to exceed $75,000.

Before the Court is a Joint Motion for Summary Judgment (Doc. 44) filed by the Alcan entities, in which they seek judgment as a matter of law on all claims asserted against them by Sibley. Those claims include breach of contract, misrepresentation, wrongful discharge, and promissory estoppel. Sibley has filed a Memorandum in Opposition (Doc. 47), and the Alcan entities have filed a joint Reply (Doc. 51). Accordingly, this matter is ripe for adjudication.

For the reasons articulated below, the Court **GRANTS** the Joint Motion for Summary Judgment (Doc. 44) and **DISMISSES** all counts asserted in the Complaint.

## I.     BACKGROUND

The following facts are not in dispute, except where noted.  Alcan, Inc. is a Canadian corporation specializing in aluminum rolling and recycling.  AMS operates as a management services company, providing management and professional services to Alcan, Inc.  Rolled Products Americas and Asia Group ("Rolled Products") was a division of Alcan, Inc. at the time Sibley first became involved with the Alcan entities, but is now a wholly owned subsidiary of Alcan, Inc.  Sibley worked for the Alcan entities for approximately three months - from March 1, 2004 to June 9, 2004. During that time, he was employed by AMS and performed work for Rolled Products.   The claims in this lawsuit implicate both the circumstances of Sibley's hiring and the events leading to his eventual discharge.

In or around 2003, Martha Brooks ("Brooks"), President of both Rolled Products and AMS, solicited Sibley for the newly-created, senior position of Vice President of Marketing and Sales for the Rolled Products Group.  Sibley was then working as Vice President of Sales and Program Management at a large manufacturing company near Detroit, Michigan.  According to Sibley's general understanding of Rolled Products, he believed the entity to be a division of Alcan, Inc. - at least as of the time he was being recruited by Brooks.  Later, however, after Sibley began working for the Alcan entities, an announcement was made that the company would be spinning off their Rolled Products Group into a separate entity, which would then become a wholly-owned subsidiary of Alcan, Inc.  That spin-off did not occur, however, until after the events at issue in this proceeding; the new entity is Novelis.

During his three days of interviewing for the position of Vice President of Marketing and Sales for the Rolled Products Group, Sibley does not recall Alcan representatives ever mentioning

they intended for him to eventually work for AMS; nor does he recall any discussion regarding the

possibility of Alcan spinning the Rolled Products Group off into a separate corporate entity.

Nevertheless, it is clear from the record that, at the time of Sibley's separation from the Alcan

entities, his position within Alcan had not changed in any meaningful way from the position he

agreed to, and accepted, when he first began his employment with Alcan.  Specifically, during his

three months with the Alcan entities, there was no change in job title, realignment of sales territory,

loss of benefits, reduction in compensation, or any other change in Sibley's employment status.  Nor

was there any change in who reported to Sibley, and who Sibley reported to.  This was because, at

the time of the announcement of the spin-off, Alcan had not yet determined what Sibley's role in the

reorganization would be - including the reporting structure for Sibley.  *Deposition of Gregory Sibley,*

at pp. 110; 113; 119-121; 189.[1]

The contemplated Rolled Products spin-off is significant, therefore, only because Sibley's

claims in this action focus on his alleged reliance on factors he believed to be unique to Alcan, Inc.

in deciding to accept the job offer in the first instance.  Among these were Sibley's desire to work

for a company with a low debt load, which Alcan, Inc. apparently carried.  Sibley supposes that

Rolled Products, on the other hand, would likely be heavily leveraged as an independent entity.

Sibley was further drawn to Alcan, Inc.'s ownership of power generation assets internationally,

which he contends gave Alcan, Inc. an advantage among its competitors.  Sibley additionally asserts

---

[1]    Sibley further testified that he was not with the Alcan entities long enough to
determine whether employment with AMS, rather than Alcan, Inc., would result in any difference
in his compensation.  *Deposition of Gregory Sibley,* at pp. 122-124.  For all Sibley knew, the
reorganization could have benefitted him rather than being the detriment he now describes, because,
as Sibley acknowledged, how the spin-off might have affected his compensation and job status was
entirely speculative.  *Deposition of Gregory Sibley,* at pp. 214-215.

3

that, as an employee of Alcan, Inc.,  he believes there would be greater opportunities for professional growth than as an employee of a smaller entitity.

Sibley's position in this litigation, accordingly, is that he would not have accepted Alcan's job offer had the Alcan entities disclosed during the interview process that they were considering a spin-off of the Rolled Products Group.  The alleged inconsistencies between what Sibley was told in the interview process and what his situation presumably would be after the anticipated Rolled Products spin-off, are what forms the basis of Sibley's misrepresentation claim.  *Complaint*, at ¶¶ 4-6; *Memorandum Opposing Defendants' Motion for Summary Judgment*, at pp. 3-5.

In addition to Sibley's claim that Alcan misrepresented the true nature of his employment with the Alcan entities, Sibley claims Alcan breached an employment agreement.  In his Complaint, Sibley claims Alcan offered him a three-year term of employment.  *Complaint*, at ¶ 7.  Sibley argues this gave rise to an employment contract, which the Alcan entities breached by discharging him without just cause prior to the expiration of the three-year term.  *Memorandum Opposing Defendants' Motion for Summary Judgment*, at pp. 15-19.

Alcan, however, denies there was ever an employment agreement for a specific term of years. It claims Sibley's employment status was simply that of an at-will employee.  Being an at-will relationship, Alcan believes it was entitled to terminate Sibley at any time, for any reason.  In the alternative, Alcan argues that, even if there is sufficient evidence of an employment contract, there is also ample "just cause" for Sibley's discharge because the discharge was the result of highly inappropriate conduct at a business event - including an apparent inability on the part of Sibley to appreciate the seriousness of, or exhibit any remorse for, his conduct.  *Joint Motion for Summary Judgment*, at pp. 16-18.

4

The conduct leading to Sibley's discharge is as follows.  Between June 4 and 6, 2004, Sibley, along with multiple co-workers and subordinates, attended a Habitat for Humanity charity golf event in South Carolina.  The event was hosted by the CEO of the Rolled Products division. Senior representatives from high-end customers of Rolled Products were also in attendance.  Alcan intended the event to be an opportunity for its suppliers, senior management, and best customers to get to know one another.  Indeed, Sibley confirmed the event was "very important" to the CEO of Rolled Products.  *Deposition of Gregory Sibley,* at p. 131.

Over the course of the three-day golf event, Sibley engaged in behavior the Alcan entities found to be offensive and disruptive.  The behavior involved Sibley committing the following acts: drinking alcohol excessively; drinking alcohol in the back seat of a moving vehicle while discussing, in front of a subordinate's wife,  his need to urinate; hitting golf balls from his bungalow onto the golf course below while guests were playing golf; requesting a foot massage from the same subordinate's wife; and throwing shrimp covered in cocktail sauce at the subordinate's wife during a party at the CEO's home.  *Joint Motion for Summary Judgment*, at pp. 6-9.  Sibley confirmed certain aspects of these events in his deposition.  For instance, he agrees that he brought beer into the car he was riding in - as a passenger - on the way to South Carolina, and that, after consuming the beer, he discussed the need to relieve himself and attempted to leave the car for the stated purpose of doing so.  *Deposition of Gregory Sibley,* at p. 142-145.  Although the precise language used by Sibley to describe the urgency of his need is disputed by Sibley (specifically, the alleged use of profanity), Sibley admits discussing the topic in front of the wife of one of Sibley's direct subordinates.  *Id.*  He also confirms requesting a foot massage from the same woman during a car ride to a social event, and that this request occurred after Sibley spent the afternoon consuming "4

5

to 5 beers" at the golf course clubhouse and "a few more beers" in his bungalow, where he concedes he was hitting golf balls from the terrace to the golf course below.  *Deposition of Gregory Sibley,* at pp. 150-157.  Finally, Sibley confirms that, while at a party with senior management and Alcan customers at the house of Rolled Products' CEO, he tossed two shrimp tails at the same subordinate's wife just to be - in his words - playful.  *Deposition of Gregory Sibley,* at pp. 26-28; 161-162.  Although Sibley testified he was unaware that the shrimp tails still had cocktail sauce on them, the tails, nevertheless, landed on the woman's dress with cocktail sauce, staining her dress and causing her to cry.

In response to that incident, the woman's husband - Sibley's co-worker and subordinate - punched  Sibley in the face.  Sibley suffered a bloody nose as a result. Sibley's co-worker immediately apologized to the CEO of Rolled Products and admitted his wrongdoing; Sibley did not. Nor did Sibley  complain to Brooks or any other senior member of Alcan management about his subordinate's reaction  to Sibley's repeated inappropriate interactions with that subordinates' wife. *Deposition of Gregory Sibley,* at p. 165. Sibley did, however, apologize to the co-worker's wife when he saw her and her husband at breakfast the next day.  *Deposition of Gregory Sibley,* at pp. 171-172.

Sibley claims he eventually reported what he characterizes as "an assault" to Alcan management several days later, after being called into a meeting with Brooks to discuss the matter. Sibley asserts he was discharged the next day in retaliation for reporting the assault.  Sibley argues, therefore, that he was wrongfully discharged in violation of public policy - the policy being deterrence of workplace violence in general, and assaults in particular.  *Memorandum Opposing Defendants' Motion for Summary Judgment*, at pp. 20-22.

Aside from questioning the legitimacy of the public policy claimed to be violated, Alcan claims there is nothing in the record indicating Sibley ever reported an assault. *Joint Motion for Summary Judgment*, at p. 15.  Alcan further argues Sibley cannot show any connection between his discharge and having allegedly reported an assault for purposes of a retaliation claim, primarily because Brooks testified she was aware of the assault several days before Sibley discussed it, and had conducted an investigation into the events of the weekend independent of any alleged "report" from Sibley. *Deposition of Martha Brooks*, pp. 120-126.  In response to that investigation, Alcan disciplined both Sibley and his subordinate. [2]

Finally, in anticipation of Sibley's claim that the Alcan entities lacked an overriding legitimate business justification sufficient to rebut the alleged public policy violation, Alcan points to Sibley's conduct the entire weekend of June 4-6, 2004.  Alcan focuses on a greater concern this conduct implicated in Alcan's mind; specifically, Sibley's refusal to acknowledge that any of his behavior that weekend was inappropriate in any manner when called to task about his behavior, Sibley did not acknowledge any impropriety and expressed no remorse. *Deposition of Gregory Sibley*, pp. 180-181; *Deposition of Martha Brooks*, pp.130-131.  Brooks, who hired Sibley, testified

---

[2]     While Sibley argues that his subordinate was not discharged, he does so with no factual support, and it is clear from the record that his claim is not true.  Specifically, the undisputed testimony of Alcan management and the co-worker who assaulted Sibley is that the co-worker was initially informed he also was being discharged, but that, due to his twenty-two years of unblemished performance and his acknowledgment of wrongdoing, there was an outside chance the company could try to find another position for him.  The co-worker was issued a suspension (with no guarantee of employment), but eventually rehired with a substantial demotion.  As a result of the demotion, the co-worker went from overseeing over a thousand employees to having zero direct reports - and also dropped several job grade levels.  The reduction in job grade cost the co-worker approximately $20,000.00 in total compensation, the use of a company car, and a significant reduction in his participation in Alcan's Employee Stock Option Plan. *Deposition of William Herr*, pp. 44-49; *Declaration of David Godsell*, at ¶4; 6.

7

that senior Alcan representatives questioned  Sibley's future propensity for unprofessional behavior given his apparent inability to comprehend the seriousness of the situation in South Carolina. *Deposition of Martha Brooks*, pp. 130-150.  This, Alcan claims, is in stark contrast to the employee that punched Sibley and immediately apologized to the CEO of Rolled Products.  The bottom line for Alcan, it asserts, was the company's fear that, as Vice President of Global Marketing and Sales, Sibley could not be trusted to protect Alcan's best interests.  *Joint Motion for Summary Judgment*, at p. 12.  Alcan, thus, claims it had an overriding business reason for discharging Sibley.

## II.    ANALYSIS

### A.    Scope of the Record

Before beginning its analysis, the Court first defines the scope of the record upon which that analysis relies.   The Alcan entities, in their original Motion for Summary Judgment and their Reply Brief, rely on the sworn deposition testimony of Sibley and other witnesses.  In contrast, Sibley cites almost exclusively to his own 13-page, 46-paragraph Declaration as support for his opposition.  In questioning why Sibley would so obviously neglect to cite to any of his prior deposition testimony, the Court confirmed an argument forcefully made by the Alcan entities in their reply brief.  Sibley's deposition testimony has been "altered" by what appears to be, in several respects, a contradicting Declaration.  Without beleaguering the point, the Court notes that Sibley - in his Declaration - denies having any intent whatsoever with respect to throwing shrimp at the CEO's party.  To that end, he claims in his Declaration that he was tossing shrimp in the general direction of a kitchen sink.  Yet, repeatedly in his deposition, Sibley testified that he was throwing shrimp **at** a co-worker's wife and that his intention was to be "playful" with her.  He further testified that he assumed the impetus for the assault against him was because he was throwing shrimp **at** a co-worker's wife. *Deposition of*

8

*Gregory Sibley,* at pp. 26-28; 161-162.  Sibley's statements in his Declaration that he was hired by Alcan for a three-year term based upon express representations made by Alcan are, likewise, in conflict with his prior deposition testimony.  There, Sibley made it clear that Alcan representatives never raised, or discussed, the issue of any particular length of employment for Sibley, or what the criteria and standards would be to sever the employment relationship.  *Deposition of Gregory Sibley,* at pp. 115; 207-208.  In response to the direct question of whether anyone from Alcan ever discussed being employed for X number of months or X number of years, Sibley was entirely unable to point to a specific, affirmative representation on the part of Alcan that would confirm the alleged, express representation of a three-year term of employment.

Because, in certain respects, Sibley's Declaration runs afoul of Fed. R. Civ. P. 56 and is in violation of the well-established rule that an affidavit which contradicts prior sworn testimony cannot create an issue of fact sufficient to support an opposition to summary judgment, the Court cannot consider any contradictory narratives in Sibley's Declaration.  *See Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *see also Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006), *reh'g denied* (June 20, 2006)(distinguishing legitimate efforts to supplement incomplete deposition testimony by a party who was ***not directly questioned*** about an issue, from attempts to create a sham issue of material fact).  To the extent this Opinion requires consideration of these disputed issues, the Court is confined to Sibley's deposition testimony.

### B.      Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment motions and provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions,

9

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

**C.    Discussion**

For purposes of motion practice in this case, the Court - in an Amended Case Management Order dated January 5, 2006 - set specific parameters for the parties to follow. The two issues contemplated by the Court were:

> Dispositive motions shall address only the following issues (1) whether plaintiff's discharge was justified; and (2) whether the misrepresentation claim can survive as a matter of law if the discharge was justified.

*See* Doc. No. 38.  In other words, the Court asked the parties to address  not only whether Sibley's discharge was wrongful - as Sibley alleged - but also whether any alleged misrepresentations to Sibley at the time he was hired are actionable if it was not.[3]

As discussed below, the parties addressed the first question head-on in their briefs, with Sibley claiming he did nothing that could have justified his discharge, and Alcan claiming it had every right to terminate Sibley's employment when and why it did.  On the second question, the parties briefing is less symmetrical.  Alcan argues that any damages claimed by Sibley are the direct result of an event - of Sibley's making - that has no relationship whatsoever to the misrepresentations Sibley has identified.  Alcan claims, therefore, that, because there is no nexus between the pre-hiring statements and Sibley's discharge, Sibley's claim of fraud must fail.  *Joint Motion for Summary Judgment*, at pp. 20-21.  Sibley argues, on the contrary, that he has damages <u>independent</u> of those resulting from his discharge. Specifically, he says he received a lower payout on stock options from

---

[3]       The Court limited the issues to be address in this fashion so as to obviate the need to resolve discovery disputes relating to matters which may become moot.  Specifically, Sibley sought expansive discovery relating to all the business decisions and discussions relating to the Rolled Products spin off, and sought detail financial data relating to the same.  Alcan argued that this discovery was unduly burdensome, designed to harass, and sought highly confidential business data. Alcan sought protection from the need to provide the full extent of the data requested until a determination could be made about whether that data was even relevant to an issue which might proceed to trial in this matter.   While the Court ordered Alcan to reveal information regarding the timing and progress of its Rolled Products decision making, the Court refused to order the production of all of Alcan's financial and confidential data pending a determination of the relevance of that proposed discovery.  Thus, the Court structured the dispositive motions so as to address whether, even assuming that certain misrepresentations had been made to Sibley when hired, a course of action could be premised thereon in the face of an appropriate discharge of Sibley following the South Carolina outing.

his former employment because he left for Alcan, and he was at risk of failing to realize what Sibley believed would be greater returns from Alcan "over the long-term." *Memorandum Opposing Defendants' Motion for Summary Judgment*, at pp. 5, 13, 14, 24.  Sibley, thus, argues he has alleged damages that are "beyond those resulting from a loss of pay and benefits upon his discharge from Alcan." *Id.*, at p. 24.

Irrespective of how the parties have chosen to brief the second question posed by the Court, it is clear Sibley must show damages directly attributable to his reliance on the misrepresentations he has alleged.  In this respect, Alcan has focused its arguments on whether Sibley has alleged an injury that is causally connected to the alleged misrepresentations and Sibley, likewise, has chosen to discuss his injury.  Because the Court finds the record is adequately developed for the Court to address both questions posed by it, the Court proceeds to do so.

### 1. Breach of Contract Claim

Count One of Sibley's Complaint alleges that Alcan breached an employment agreement with Sibley.  The first issue this Court must address, therefore, in determining whether Alcan is entitled to judgment as a matter of law on Sibley's breach of contract claim, is whether Sibley and Alcan formed an employment contract in the first instance.  The second issue is, if a contract were formed, whether Sibley was discharged for just cause.  For the reasons detailed below, the Court finds that no employment contract for a term of years exists between Sibley and Alcan.  It is, therefore, unnecessary to determine whether his discharge was for just cause.

In Ohio, when the nature of an alleged employment agreement is in question, the presumption is that the employment is at-will.  *Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d 100, 103, 483 N.E.2d 150, 153 (1985); *see also Kusens v. Pascal Co. Inc.*, 448 F.3d 349, 366 (6th Cir. 2006).

12

Under the employment-at-will doctrine, the employment relationship between employer and employee is terminable at the will of <u>either</u>. An employee is subject to discharge by an employer at any time, without any reason or cause, with impunity. *See Wright v. Honda of Am. Mfg., Inc.*, 73 Ohio St. 3d 571, 574, 653 N.E.2d 381, 384 (1995). Similarly, an employee is free to voluntarily leave his employment for other opportunities, at any time, without any explanation. There is an exception to this doctrine: the terms of discharge may be altered when the conduct of the parties indicates an intent to impose different conditions regarding discharge. *Condon v. Body, Vickers & Daniels*, 99 Ohio App. 3d 12, 18, 649 N.E.2d 1259, 1263 (Ohio App. 8th Dist. 1994). Ohio has, therefore, recognized the existence of express or implied contractual provisions which may alter the at-will relationship. *See, e.g., Wright*, 73 Ohio St. 3d at 574, 653 N.E.2d at 384.

In any action alleging breach of an express or implied employment contract, however, "the burden is upon the party asserting the existence of an employment contract to prove each element necessary for the formation of the contract." *Baker v. Jones & Henry Engineers, Ltd.*, No. L-00–1198, 2001 WL 304088, at *2 (Ohio App. 6th Dist. 2001); *see also Penwell v. Amherst Hosp.*, 84 Ohio App. 3d 16, 21, 616 N.E.2d 254, 258 (Ohio App. 9th Dist. 1992)(consistent with the presumption of at-will employment, "[t]he party asserting an implied contract of employment has a heavy burden ... [h]e must prove the existence of each element necessary to the formation of a contract."). Although it is well-established, "[t]he elements of a contract are mutual assent, generally offer and acceptance, and consideration. Moreover, the party on whom the burden of proof rests must also show that there was a "meeting of minds" and that the essential terms of the contract are definite." *Baker*, 2001 WL 304088, at *2 (citing *Nilavar v. Osborn*, 711 N.E.2d 726 (Ohio App. 6th Dist. 1998)). "A meeting of the minds as to the essential terms of the contract is a requirement to

13

enforcing the contract." *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002)(citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 575 N.E.2d 134 (Ohio 1991)).

Sibley claims in his Complaint that, during the solicitation process, Alcan represented to him that the employment offered was for a three-year term. *Complaint*, at ¶ 7. Sibley claims, therefore, in Count One of the Complaint, that Alcan breached "the contract" with Sibley by terminating his employment "without notice or cause." *Complaint*, at ¶ 20. The question for the Court, therefore, is straightforward: Has Sibley shown the existence of each element of a contract and satisfied his burden of coming forward with evidence sufficient to rebut the at-will presumption? The Court finds Sibley has not.

According to Sibley, when he accepted Alcan's offer of employment, he had ***no understanding*** as to what the criteria would be - or what the standards were - for either Sibley to voluntarily leave his position, or for Alcan to sever the relationship. *Deposition of Gregory Sibley,* at p. 115. This essential term of an employment contract was not definite - nor is there any basis in the record for claiming a "mutual understanding" between Sibley and Alcan on this term. Sibley's own testimony belies any claim that there was an intent on the part of Alcan to "alter the terms of discharge" and, accordingly, bind each party to the other under conditions that would be sufficient to rebut the presumption of at-will employment.

With respect to a defined length of employment, Sibley does not point to a specific, affirmative representation on the part of Alcan. He relies instead on discussions regarding his past experience with a former employer, and the length of time it took to accomplish goals similar to those Alcan was expecting Sibley to fulfill.

During the interview process, a planning philosophy was presented to Alcan ***by Sibley***. The

14

planning philosophy was represented by Sibley as being a "three year plan in process" - which Sibley had utilized, with success, at his former place of employment. *Deposition of Gregory Sibley,* at pp. 207-208. It was Sibley's own "presumption," therefore, according to his sworn testimony, that led him to believe his employment at Alcan would be a "two to three year assignment" based upon his planning philosophy. *Deposition of Gregory Sibley,* at pp. 207-208. Indeed, when Sibley was **questioned directly** if anyone from Alcan ever discussed being employed for X number of months or X number of years, Sibley simply testified in his deposition that Alcan representatives indicated they "liked the planning philosophy." *Id.* His own testimony, however, indicates the "planning philosophy" was indefinite - it could take anywhere from two to three years to achieve under Sibley's presumption. This is, quite simply, insufficient as a matter of law to establish a clear and unambiguous promise of continued employment for a specific period as required by Ohio law.[4]

In an attempt to corroborate these oral statements, however, Sibley has come forward with a letter from Alcan to the Canadian government requesting permission for Sibley to obtain a work permit for a temporary period of three years. Sibley argues this document conclusively establishes that Alcan offered Sibley a three-year term of employment. Setting aside an authentication issue

---

[4]     *See, e.g., Daup v. Tower Cellular, Inc.*, 136 Ohio App. 3d 555, 561-62, 737 N.E.2d 128, 133 (Ohio App. 10th Dist. 2000)(holding that oral statements where employer continuously encouraged employee to "look at this [job] five or ten years from now ... look at where you are going to be ... it is just going to get bigger and better," combined with statements that the employer foresaw a "relationship that would be very long," did not create an implied contract for a term of years); *Condon v. Body, Vickers & Daniels*, 99 Ohio App. 3d 12, 19, 649 N.E.2d 1259, 1263-64 (Ohio App. 8th Dist. 1994)(statements by employer that firm was looking for associate to participate in five-year training program and statements that employee had a job as long as he did not "use the Firm or date the secretaries" found insufficient to establish an implied contract altering employee's at-will status to employment for a term of five years); *Eagleye v. TRW, Inc.*, Cuyahoga App. No. 64662, 1994 WL 50671 (affirming summary judgment in favor of employer and finding no specific promise of continued employment where employee was told, "If you stick with me for three to five years, I will give you Kovicky's job.").

15

mentioned, but not briefed, by Alcan,[5] the Court need not determine whether any of the statements offered by Sibley in the letter are sufficiently definite to indicate a mutual agreement between Sibley and Alcan for employment with a definite term.  This is because Sibley is forced to contend with Ohio's statute of frauds: on its face, any purported contract would be one that could not be completed within one year.[6]

Although not briefed by either party, Sibley presumably believes the letter request for a Canadian work permit satisfies the writing requirement that the statute of frauds demands.[7]  Any such presumption, however, is unfounded.  A signed memorandum is sufficient to satisfy the statute of frauds in Ohio only where it:

> (1)  identifies the subject matter of the agreement;
>
> (2)  establishes that a contract has been made; and

---

[5]  Fed. Civ. R. 56(c) provides an exclusive list of materials that a district court may consider when deciding a motion for summary judgment.  Those materials are pleadings, depositions, answers to interrogatories, admissions on file and affidavits, if any.  An unsworn letter, between a party and a non-party, is clearly not one of those materials.  Other types of documents may be introduced as evidentiary material; however, only by way of incorporation by reference in a properly framed affidavit.  Documents that have not been sworn, certified, or authenticated by way of affidavit generally have no evidentiary value - even though attached to a brief opposing summary judgment.

[6]  No action shall be brought whereby to charge the defendant, ... upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized. O.R.C. § 1335.05.

[7]  Sibley claims in a single, lone statement found in the Conclusion to a Surreply he filed in this case that: "[t]he contract is not subject to the statute of frauds because a writing exists signed by Alcan which admits the contract."  *Surreply*, at p. 4.  This is the only time the phrase "Statute of Frauds" appears in any of the briefs submitted by the parties, and Sibley has not come forward with any legal authority supportive of this general conclusion.

16

(3)     states the essential terms with reasonable certainty.

*Landskroner v. Landskroner*, 154 Ohio App. 3d 471, 483, 797 N.E.2d 1002, 1011 (Ohio App. 8th

Dist. 2003)(citing *Kling v. Bordner*, 65 Ohio St. 86, 61 N.E. 148 (1901)).

In this case, the request for a work permit submitted by Alcan to the Canadian government

on behalf of Sibley does not give rise to any inferences with respect to Sibley's employment status

with Alcan because it does not provide any information contemplating employment for a term of

years. In fact, the language in the letter actually cuts <u>against</u> Sibley's arguments regarding a definite

term of employment, as it consistently indicates the request was being submitted:

> "[S]o that [Sibley] may be authorized to render ***temporary services***
> for Alcan, Inc. in Canada"
>
> * * *
>
> "Mr. Sibley's presence is required in Canada for a ***temporary period
> of three (3) years, as timely required***"
>
> * * *
>
> "[I]t has been ***resolved to temporarily employ*** Mr. Sibley as Vice-
> President, Marketing & Sales for the Rolled Products Americas and
> Asia Business Group in Canada"
>
> * * *
>
> Among other impressive achievements, ... Mr. Sibley has ***put in place
> a three-year <u>business plan</u>*** that has successfully ensured growth and
> development of [Tenneco Automotive]
>
> * * *
>
> [H]is specific expertise and knowledge of business management and
> growth at an international level makes him the ***ideal candidate to
> temporarily fulfill the offered position*** of Vice-President, Marketing
> & Sales for the Rolled Products Americas & Asia Group in Canada.

The work permit request in this case, thus, is nothing more than what any work permit

request is - a request for an employee to stay in the country for a temporary period of time. A request

for a work permit casts no more light on whether these parties formed an employment contract for

17

a term of years than would a request for a temporary Canadian driver's permit.  Just as importantly, however, Sibley testified in deposition that the application to the Canadian government to "get you [Sibley] a Canadian work visa" occurred approximately two weeks **after** Sibley had accepted employment with Alcan: the request was part of the change in structure that was envisioned as a result of the impending spinoff.  *Deposition of Gregory Sibley*, p. 122-124.  The request, accordingly, cannot be used to prove what was in the parties' minds *at the time Sibley was hired*.[8]

Sibley has not offered so much as a memorandum confirming an agreement for a term of years.  Without any other evidence, his word alone is insufficient to overcome the strong presumption that he is employed at-will.  As an at-will employee, his discharge was justified as a matter of law since it is well settled that an at-will employment arrangement can be terminated at any time, for any reason, by either party.  *Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d 100, 483 N.E.2d 150 (1985).  As sophomoric, unprofessional, and potentially injurious as Alcan claims Sibley's behavior to be, the Court need not pass judgment on whether the conduct constituted just cause for Sibley's discharge.  Because Sibley cannot establish a "meeting of the minds" on the essential terms of an employment contract, and has failed to come forward with a writing that clearly evidences employment for a defined term of years and satisfies the statute of frauds, Alcan is entitled to judgment as a matter of law on Sibley's breach of contract claim.

### 2.  Wrongful Discharge Claim in Violation of Public Policy

In Count Three of the Complaint, Sibley claims the Alcan entities are liable to him for "wrongful discharge in tort for having discharged him in retaliation for having reported an assault

---

[8]    The fact that Alcan may have hoped that its decision to hire Sibley was a correct one, and proceeded on the assumption that his employment would last for a sustained period of time, does not create a binding agreement by Alcan to that effect.

by a fellow employee." *Complaint*, at ¶ 27.  Although neither party has raised this issue, by this Count, Sibley presumably admits his at-will employment status.  This is because, in Ohio, a claim of wrongful discharge in violation of public policy is ***only*** available to at-will employees.  At-will employment is an essential element of an Ohio public policy claim - to be pled and proven by the plaintiff.  *See, e.g., Kusens v. Pascal Co., Inc.*, 448 F. 3d 349 (6th Cir. 2006)(citing *Haynes v. Zoological Soc. of Cincinnati*, 73 Ohio St. 3d 254, 258, 652 N.E.2d 948, 951 (1995)); *Strausbaugh v. Ohio Dept. of Transport.*, 150 Ohio App. 3d 438, 449, 782 N.E.2d 92, 100 (Ohio App. 10th Dist. 2002).  The Court, therefore, addresses this claim in light of the fact that alternative pleading is permissible in this Court and because Sibley has failed to show the existence of an employment contract.

As discussed earlier in this Opinion, under Ohio law, in the absence of an employment contract, an employee works on an at-will basis and may be discharged for any lawful reason, or for no reason at all.  *Herrington v. DaimlerChrysler Corp.*, 262 F. Supp. 2d 861, 864 (N.D. Ohio 2003, Carr, J.)(citing *Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d 100, 103, 483 N.E.2d 150, 153 (1985)).  The Supreme Court of Ohio has recognized an exception to the at-will doctrine, however, with its adoption of the tort of wrongful discharge in violation of public policy in the case of *Greeley v. Miami Valley Maintenance Contrs., Inc.*, 49 Ohio St. 3d 228, 551 N.E.2d 981 (1990).  Although *Greeley* initially only recognized public policies where certain activities were statutorily prohibited,[9] subsequent case law has extended *Greeley* by recognizing "[such a claim] is not limited to situations where discharge violates a statute."  *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 242, 773

---

[9]        "[W]e hold that public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute."  *Greeley*, *supra*, 551 N.E.2d at 986.

N.E.2d 526, 529 (2002).  Ohio now recognizes a clear public policy sufficient to sustain a wrongful-discharge claim based on sources such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law.  *Wiles*, 96 Ohio St. 3d at 242, 773 N.E.2d at 529; *see also Painter v. Graley*, 70 Ohio St. 3d 377, 639 N.E.2d 51 (1994).

In deciding wrongful discharge cases, Ohio has formally adopted the analytic framework put forth by former Villanova Law School Professor Henry H. Perritt Jr. - who lists and names the elements of the tort as follows:

1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element);

2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element);

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element); and,

4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*See Collins v. Rizkana*, 73 Ohio St. 3d 65, 69-70, 652 N.E.2d 653, 657-58.

The *Collins* Court further stated that the clarity and jeopardy elements are questions of law to be determined by the court, whereas the causation and overriding justification elements are generally questions of fact.[10]  *Collins*, 73 Ohio St. 3d at 70, 652 N.E.2d at 658.  Following the precedent it established earlier in *Collins*, the Ohio Supreme Court has declined to address the

---

[10]    Though, of course, the mere characterization of an issue as a "question of fact" does not prohibit entry of Summary Judgment with respect thereto.  Where the undisputed facts are such that no reasonable juror could arrive at a contrary conclusion, even questions of fact are amenable to summary disposition.  *See* Rule 56, Fed.R.Civ.P.

causation and overriding justification elements when reviewing summary judgment motions. *Kulch v. Structural Fibers, Inc.*, 78 Ohio St. 3d 134, 151, 677 N.E.2d 308, 321 (1997). Because there is disagreement between the parties as to the causation and overriding business justification for Sibley's discharge, this Court - consistent with its duty under Ohio law - addresses only the clarity and jeopardy elements of Sibley's wrongful discharge claim.

In briefing the clarity element, Sibley claims the clear public policy violated is a policy "against workplace violence in general, and assaults in particular." *Memorandum Opposing Defendants' Motion for Summary Judgment*, at pp. 20-22. To support this argument, Sibley relies primarily on language in the Ohio Revised Code stating: "[n]o person shall knowingly cause or attempt to cause physical harm to another ..." *See* O.R.C. § 29013.13. Sibley additionally cites to an Ohio statute requiring employers to maintain safe workplaces. *See* O.R.C. §§ 4101.11-12.[11] He

---

[11]  Every employer shall furnish employment which is safe for the employees engaged therein, shall furnish a place of employment which shall be safe for the employees therein and for frequenters thereof, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes, follow and obey orders, and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. O.R.C. § 4101.11

No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe. No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters. No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe. O.R.C. § 4101.12

claims that his discharge, in ***retaliation*** for reporting a workplace assault, violates these policies. Sibley further argues, without evidentiary support, that Alcan's failure to discipline, discharge or demote Sibley's assailant jeopardizes these policies.

Alcan argues that - with respect to the clarity element - there is no public policy that would prevent an employer from "discharging an employee for engaging in juvenile behavior at the home of the Company CEO and in the presence of customer and vendor representatives - - even if that employee was subsequently punched by the victim's spouse." *Joint Motion for Summary Judgment*, at p. 14. As to the jeopardy element, Alcan claims there is no risk of jeopardizing any public policy that protects individuals who report assaults in the workplace; specifically, because there is no evidence in the record that Sibley ever reported an assault in the first place (such that he could be retaliated against as a so-called "whistleblower"). Alcan further denies there is any potential jeopardy to a public policy favoring workplace safety simply through the retention of Sibley's assailant by pointing to record evidence showing the assailant - a 22-year employee - was, indeed, punished.[12]

Ohio courts have recognized that workplace safety as public policy is an "independent basis on which a cause of action for wrongful discharge in violation of public policy may be prosecuted." *Pytlinski v. Brocar Prods., Inc.*, 94 Ohio St. 3d 77, 80, 760 N.E.2d 385, 388 (2002). Retaliation against employees who file complaints regarding workplace safety, therefore, clearly contravenes the public policy of Ohio. *Kulch,* 78 Ohio St.3d at 152-153, 677 N.E.2d at 322. It is questionable, however, whether the facts of this case comport with scenarios contemplated by Ohio's public policy favoring workplace safety.

---

[12]     (*See supra* footnote 2).

22

Here, Sibley was assaulted at a cocktail party in a private home.  The location is not a "place of employment" as that term is defined under the statutory law cited by Sibley.  Further, although arguably the event can be classified as "work-related," there were numerous non-employees at the party.  Quite simply, a work-related cocktail party at a private home is not so dangerous a place, nor was the event one which would normally give rise to workplace safety concerns, as to call into play the code sections Sibley cites to as his "clear" declaration of public policy.  By applying these sections of the Ohio Revised Code, Sibley is stretching them further than is contemplated by the policies themselves.

Assuming, *arguendo*, that Plaintiff has satisfied the clarity element, however, he fails to demonstrate how his discharge ***under these circumstances*** will jeopardize that public policy.  In analyzing the jeopardy element, it is critical that this element is not satisfied by a mere showing that the policy has simply been violated; it demands that the "policy itself is at risk if dismissals like the one in question are allowed to continue."  *Langley v. DaimlerChrysler Corp.*, 407 F.Supp.2d 897, 909 (N.D. Ohio 2005)(quoting *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 659 (6th Cir. 2005)(applying Ohio law).  Therefore:

> [A] plaintiff who cites workplace safety as the public policy satisfying the clarity element ... must have at least lodged complaints about workplace safety in order to satisfy the jeopardy element of the claim, and, furthermore, the employee must at least have made clear to his employer that he is invoking a [safety] policy as the basis for his complaint, not just his own self-interest.

*Id.* (internal citations omitted).

Here, Sibley asks this Court to recognize that Ohio's policy favoring a safe workplace free from assaults would be at risk if his discharge were permitted.  This hardly seems the case.  Assault

is a criminalized behavior. A victim of assault, regardless of where the assault took place, is able to notify authorities to press criminal charges against the assailant. A public policy against assaults is further protected by tort remedies available to the victim. Sibley makes no assertions that he pursued criminal or civil actions against his assailant. Indeed, he admits he did not even <u>report</u> the assault to anyone at Alcan until several days later - and only as the result of being called into a meeting with Brooks to discuss the events of the weekend, including the assault. *Deposition of Gregory Sibley*, pp. 165; 179. Sibley, therefore, did not lodge concerns about ***overall workplace safety*** should Alcan choose to retain the assaulting co-worker. He did not even voice a complaint in his own self-interest, much less the interest of others, sufficient to demonstrate an actual jeopardy in the workplace.

Sibley, quite simply, has not demonstrated how he was retaliated against for "reporting" a workplace assault. Brooks testified, under oath, that she already knew about the assault several days before contacting Sibley to discuss the matter, and that she had undertaken an independent investigation to determine the proper course of action. *Deposition of Martha Brooks*, pp. 120-23; 126. Indeed, Sibley admits Brooks knew about the assault at the time <u>she</u> <u>requested</u> <u>to</u> <u>speak</u> <u>to</u> <u>him</u> about the events of the weekend. *Deposition of Gregory Sibley,* p. 179. Sibley's general discussion of the incident, in response to being called to task for the events precipitating the assault, is hardly the type of "reporting" envisioned by statutory measures shielding whistleblowing employees from retaliatory conduct. Since Sibley did not seek the remedies alleged to be afforded by the law pursuant to the public policy he seeks to invoke, it is unreasonable to assume the public policy has been jeopardized by Sibley's discharge. Having failed to establish an essential element of a claim for retaliatory discharge in violation of public policy, Sibley cannot invoke this exception to escape

any claimed harshness of the employment-at-will doctrine.  Alcan was, therefore, entitled to discharge Sibley for any reason not contrary to public policy - which the Court finds it did because no public policy was placed in jeopardy - and summary judgment in favor of Alcan is proper on this claim.[13]

### 3.    Misrepresentation Claim

Count Two of Sibley's Complaint asserts a cause of action for misrepresentation. The Supreme Court of Ohio has stated that in order to succeed on such a claim, a plaintiff must prove the following elements:

(a)    a representation or, where there is a duty to disclose, concealment of a fact,

(b)    which is material to the transaction at hand,

(c)    made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(d)    with the intent of misleading another into relying upon it,

(e)    justifiable reliance upon the representation or concealment, and

(f)    a resulting injury proximately caused by the reliance.

*Cohen v. Lamko, Inc.*, 10 Ohio St. 3d 167, 169, 462 N.E.2d 407, 409 (Ohio 1984); *see also Cardi v. Gump*, 121 Ohio App. 3d 16, 698 N.E.2d 1018 (Ohio App. 8th Dist. 1997).

With respect to Alcan's omissions and representations, the Complaint generally alleges:

4.    During the solicitation, Alcan, through its officers, made representations to Mr. Sibley about its plans and programs.
* * *
8.    During the solicitation Alcan obtained information which it had a duty to provide to Sibley.

---

[13]    While the Court is not <u>required</u> to address whether Sibley's firing was justifiable in order to resolve either his contract or public policy claims, the Court finds it unlikely that any reasonable juror would question whether Alcan's decision to fire Sibley after his ridiculous performance in South Carolina was justified.

* * *

> 10.   The information contradicted other information Alcan had already provided to Mr. Sibley.

In his brief in opposition, Sibley clarifies his claim by identifying a number of statements allegedly made during the recruitment process - all of which relate to certain acquisitions, and how those acquisitions would "fit" into Alcan's future plans for the Rolled Products Group.  It is clear from Plaintiff's arguments, accordingly,, that the general omissions and representations alleged in the Complaint relate solely to Alcan's anticipated spin-off of the Rolled Products Group.[14]

Given the nature of the statements identified by Sibley, Alcan's main argument with respect to Sibley's misrepresentation claim is summarized as: "In cases involving alleged misrepresentations made in the hiring context, a claim for fraudulent misrepresentation cannot succeed where there is no nexus between the damages alleged and the statements made to induce the plaintiff to take the job with the defendant."  *Memorandum Opposing Defendants' Motion for Summary Judgment*, at p. 20.  Alcan argues Sibley's misrepresentation claim has no basis in law because the only harm Sibley can point to is his ***discharge***, which involved conduct and repercussions totally unrelated to the statements (or omissions) about Alcan's future plans with respect to the Rolled Products Group. Sibley, however, believes he has alleged damages separate from those resulting from his discharge, such that he has an independent basis for a claim of fraudulent misrepresentation.  It is, therefore, the final element - that of injury - that is at issue in the present motion.

As noted, the omissions and representations claimed by Sibley all relate to Alcan's alleged

---

[14]   The only other representation alleged by Sibley in his brief in opposition is that Alcan represented that Sibley's employment was for a three-year term.  Any issue with respect to the length of Sibley's employment, however, goes to Sibley's claim for breach of an employment contract for a term of years - which has been analyzed earlier in this Opinion.

concealment of the Rolled Products spin-off.  Sibley, however, does not argue there is any relationship between Alcan's decision to spin the Rolled Products Group off into a separate entity and his damages.  Any such argument would be fruitless, since Sibley concedes that his damages - if such a connection existed - would be entirely speculative. *Deposition of Gregory Sibley*, p. 214-15.  Since the spin-off had not yet come to pass at the time of Sibley's termination, there simply would be no connection between Alcan's alleged failure to reveal that Sibley would be part of a new organization and any claimed damages from Sibley's reliance on those omissions.  The Alcan entities focus a large part of their joint motion on this perceived failing in Sibley's misrepresentation claim.  Finding no causal connection between the omissions and representations alleged by Sibley, and any potential damages, Alcan then argues that Sibley's damages are not from reliance on any pre-hiring statements but from his ***termination***.  This, Alcan argues, was solely of Sibley's making, and any resultant damages are not attributable to the Alcan entities.  Sibley, while denying the legitimacy of the justification, admits that Alcan's termination letter explained the basis for his termination as being the events which occurred in South Carolina (rather than any downsizing due to the allegedly concealed spin-off).

The essence of Sibley's argument in response goes something like this: If Alcan did not conceal its plans for a Rolled Products spin-off, Sibley would not have accepted the job offer in the first instance and, therefore, would not be in the position of a discharged employee (with or without cause).  Rather, he would still be employed by his former employer, which, Sibley contends, was a position with greater short-term benefits.  He asserts that  the only reason he accepted Alcan's job offer was "because he believed that over the long term, his income would be higher.  However, in the short run that was not to be the case." *Memorandum Opposing Defendants' Motion for Summary*

*Judgment*, at p. 24.  The spin-off,  in other words, threatened to preclude him from reaping the benefits that he anticipated when he took the job.  His argument, however, is nonsensical.

First, the Court agrees that Sibley's discharge is not connected in any way to the statements allegedly made by Alcan to induce Sibley to accept the job offer.   Any claimed damages, therefore, occurring as a direct result of Sibley's termination (such as lost wages, benefits, or an inability to realize the benefit of long-term employment with Alcan) simply are not cognizable.  Seemingly understanding this, Sibley points then to what he claims he lost ***at the time he accepted Alcan's offer***.  Specifically, Sibley claims that he gave up a higher value on vested stock options with his previous employer because he was required to exercise  them before accepting Alcan's offer, and that he took a pay cut when moving to Alcan. *Memorandum Opposing Defendants' Motion for Summary Judgment*, at p. 24. Sibley says he would have never agreed to these negatives if he had known that the long-term positive of working for Alcan was not in his future.   On the second point, Alcan points out that the record rebuts  Sibley's claim that he accepted a reduced salary to come to Alcan, and points to deposition testimony where Sibley agreed that his employment with the Alcan entities carried with it a (slight) increase in pay over the short-term *as well as*  the potential for even greater returns "in the long run." *Deposition of Gregory Sibley*, pp. 116-17.  As to the stock options, Sibley made the choice to switch employers with full knowledge of the implications of cutting his ties with his former employer.  When he did so, he received the benefit he bargained for -- his new job with Alcan.

Again, the crux of Sibley's misrepresentation claim is that he was led to believe he would be working for Alcan *in the long run* -- not a spun-off subsidiary of Alcan.  At the time of his discharge, however, he was still working under the same terms of employment that were present

when he was hired.  *Deposition of Gregory Sibley,* at pp. 110; 113; 119-121; 189.  Although a spin-off was contemplated, at the time of Sibley's discharge, no such entity had been created.  The injury that Sibley claims, therefore, the failure to reap returns that would offset his forfeited stock options, only occurred because he was discharged and was not a function of the spin-off.

The Alcan entities correctly point out that Sibley admitted in his sworn deposition that he was unaware of how he might be affected by the spin-off.  *Deposition of Gregory Sibley*, p. 214-15.  Sibley is, therefore, faced with the insurmountable task of demonstrating an injury resulting from an event that had not even happened.[15]  In applying Ohio law, the Sixth Circuit has stated that "the elements of [fraudulent misrepresentation] are conjunctive, and accordingly all of them must be shown."  *Graham v. American Cyanamid Co.*, 350 F.3d 496 (6th Cir. 2003).  Because Sibley has not demonstrated that he suffered an injury which proximately resulted from his reliance on Alcan's alleged misrepresentation, rather than from his discharge, Sibley's misrepresentation claim fails as a matter of law.

### 4.    Promissory Estoppel Claim

Sibley additionally argues he is entitled to damages under a theory of promissory estoppel.  Specifically, he states that Alcan "made clear and specific promises to the plaintiff to induce him to accept employment with defendant."  *See Complaint*, at ¶ 30.  Although not addressed in either party's briefing, it appears Sibley is raising this claim as an alternative to his misrepresentation claim.  Consequently, it fails on similar grounds.

Under Ohio law, a promissory estoppel claim must satisfy the following elements: "(1) a

---

[15]    Notably, the spun-off division, now Novelis, was quite successful from the start -- expanding into international markets (something Sibley says he found attractive at Alcan) and generating sales of close to a billion dollars in 2004 alone.

promise, clear and unambiguous in its terms; (2) reliance upon the promise; (3) reliance was reasonable and foreseeable; and (4) [plaintiff was] injured by [his] reliance." *Hale v. Volunteers of America*, 158 Ohio App. 3d 415, 429 (Ohio Ct. App. 2004).

Here, Plaintiff was still employed by Alcan under the very terms he was promised at the time of his discharge.  He was discharged before any injury could have possibly occurred.  Any detriment he suffered resulted from a discharge that was justified as a matter of law.

## III.    CONCLUSION

For the reasons outlined above, Defendant's Motion for Summary Judgment is **GRANTED** and this case is **DISMISSED**.


**IT IS SO ORDERED.**


                                                    s/Kathleen M. O'Malley
                                                    **KATHLEEN McDONALD O'MALLEY**
                                                    **UNITED STATES DISTRICT JUDGE**

**DATED:  March 29, 2007**